# United States Court of Appeals for the Federal Circuit

---

**ERGO LICENSING, LLC AND UVO HOLSCHER,**
*Plaintiffs-Appellants,*

**v.**

**CAREFUSION 303, INC.,**
*Defendant-Appellee.*

---

2011-1229

---

Appeal from the United States District Court for the District of Maine in case no. 08-CV-0259, Judge George Z. Singal.

---

Decided: March 26, 2012

---

JAMES G. GOGGIN, Verrill Dana, LLP, of Portland, Maine, argued for plaintiffs-appellants.

STANLEY J. PANIKOWSKI, DLA Piper LLP (US), of San Diego, California, argued for defendant-appellee. With him on the brief was KATHRYN RILEY GRASSO.

---

Before NEWMAN, LINN, and MOORE, *Circuit Judges.*
Dissenting opinion filed by *Circuit Judge* NEWMAN.

MOORE, *Circuit Judge.*

Ergo Licensing, LLC and Dr. Uvo Hölscher (Ergo, collectively) accused CareFusion 303, Inc. (CareFusion) of infringing claims of U.S. Patent No. 5,507,412 ('412 patent) relating to an infusion system. In construing the claims, the district court held that the terms "control means" and "programmable control means" are indefinite. Because the district court correctly held that no corresponding structure is disclosed in the specification, we *affirm*.

## BACKGROUND

The '412 patent describes an infusion system used to meter and simultaneously deliver fluids from multiple fluid sources into a patient's body. Each fluid is individually metered so that different fluids may be discharged at different rates. '412 patent col.1 ll.6-11, col.2 ll.41-49. To meter the fluids, adjusting means are associated with each fluid source that influences the fluid flow for each source. *Id.* col.1 ll.9-12. The adjusting means are coupled to a central control device, which permits the selective actuation and control of individual fluid flow sources via the adjusting means. *Id.* col.1 ll.9-16, col.2 ll.41-49. The control device has data fields that "describe at least the metering of the individual fluid flows," which can be accessed by an operating surface. *Id.* The operating surface consists of a screen and keypad for viewing and setting the information in the control device, such as the metering rate for each fluid flow source. *Id.* col.5 ll.23-52.

Ergo sued CareFusion for infringement of claims 1-12, 15-16, and 18-20. Prior to the *Markman* hearing, the parties stipulated that several terms were means-plus-

function terms, including the terms "programmable control means" and "control means." J.A. 213-15. The programmable control means in claim 1, for example, reads as follows:

> programmable control means coupled with said adjusting means for controlling said adjusting means, said programmable control means having data fields describing metering properties of individual fluid flows;

The parties agreed that the analysis for both terms is the same and that the function for the terms is "controlling the adjusting means." J.A. 1, 9. The district court held that the "control means" terms are indefinite for failure to disclose corresponding structure. *Ergo Licensing LLP v. CareFusion 303, Inc.*, 744 F. Supp. 2d 381, 388 (D. Me. 2010). Ergo appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

### DISCUSSION

We review claim construction and indefiniteness *de novo*. *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999). Section 112, ¶ 2 requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 (2006). An applicant may express an element of a claim "as a means or step for performing a specified function . . . and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. In exchange for the ability to use a generic means expression for a claim limitation, "the applicant must indicate in the specification what structure constitutes the means." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007). Such

structure "must be clearly linked or associated with the claimed function." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003). Failure to specify the corresponding structure in the specification amounts to impermissible pure functional claiming. *Id.* at 1211. "Although [§ 112 ¶ 6] statutorily provides that one may use means-plus-function language in a claim, one is still subject to the requirement that a claim 'particularly point out and distinctly claim' the invention." *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc). If an applicant does not disclose structure for a means-plus-function term, the claim is indefinite.

Ergo argues that the corresponding structure for "control means" is the recitation of "control device" throughout the specification. Ergo contends that the general disclosure of a "control device" is all that is necessary because a control device is a generic structure known to those skilled in the art. Such a control device, according to Ergo, is synonymous with a general-purpose computer, even though a computer is not recited in the specification. Ergo argues that disclosure of an algorithm was not required, because a general-purpose computer can perform the function. Ergo claims that the specification describes additional structure of the control device, in particular that it has processing capabilities, can generate control commands, and has memory. Ergo also claims that the specification's teaching that the control device has a "programming means" constitutes "the structure with which control and monitoring functions can be performed." Appellant's Reply Br. at 7-8 (emphasis omitted).

None of these disclosures, however, are structure for the function of "controlling the adjusting means." The recitation of "control device" provides no more structure

than the term "control means" itself, rather it merely replaces the word "means" with the generic term "device." The specification discloses that the control device has memory, but memory is not structure capable of performing the function of "controlling the adjusting means." While in some circumstances generic structural disclosures may be sufficient, that is not the case here. *See, e.g.*, *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1376-77 (Fed. Cir. 2010) (holding that "controller" was sufficient disclosure because "[t]he record shows that an ordinary artisan would have recognized the controller as an electronic device with a known structure"). In this case, Ergo's expert testimony illustrates that those skilled in the art would not recognize a "control device" as a known structure. J.A. 73 at 99:2-19. Instead, Ergo's expert explained that there were at least three different types of control devices commonly available and used at the time to control adjusting means: microprocessors, discrete circuits connected to stepper motors, and analog circuits. *Id.* Although one of skill in the art may have been able to find a structure that would work, that does not satisfy § 112 ¶ 6. Under § 112 ¶ 6, a patentee is only entitled to "corresponding structure . . . *described in the specification* and equivalents thereof," not any device capable of performing the function. 35 U.S.C. § 112 ¶ 6 (emphasis added); *see also Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("That ordinarily skilled artisans could carry out the recited function in a variety of ways is precisely why claims written in 'means-plus-function' form must disclose the particular structure that is used to perform the recited function."). As Ergo's expert testimony demonstrates, the "control device" is not a specific structure.

As to Ergo's claim that "control device" is synonymous with computer, even if we were to accept that one skilled

in the art would understand a control device to be a general-purpose computer, the specification fails to disclose a corresponding algorithm required by our precedent. In *WMS Gaming Inc. v. International Game Technology*, we explained that computer-implemented means-plus-function terms are limited to the algorithms disclosed in the specification. 184 F.3d 1339, 1348 (Fed. Cir. 1999). We later clarified that *WMS Gaming* "established that the corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249, 1254 (Fed. Cir. 2005).

Until recently, we have consistently required "that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *See Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). "Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6." *Id.* Requiring disclosure of an algorithm properly defines the scope of the claim and prevents pure functional claiming.

*In re Katz Interactive Call Processing Patent Litigation* identified a narrow exception to the requirement that an algorithm must be disclosed for a general-purpose computer to satisfy the disclosure requirement: when the function "can be achieved by any general purpose computer without special programming." 639 F.3d 1303, 1316 (Fed. Cir. 2011). In *In re Katz*, we held that "[a]bsent a possible narrower construction" of the terms "processing," "receiving," and "storing," the disclosure of a general-

purpose computer was sufficient. *Id.* We explained that "[i]n substance, claiming 'means for processing,' 'receiving,' and 'storing' may simply claim a general purpose computer, although in means-plus-function terms." *Id.* at 1316 n.11. In other words, a general-purpose computer is sufficient structure if the function of a term such as "means for processing" requires no more than merely "processing," which any general-purpose computer may do without any special programming. *Id.* at 1316-17. If special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies. It is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed.

The "control means" at issue in this case cannot be performed by a general-purpose computer without any special programming. The function of "controlling the adjusting means" requires more than merely plugging in a general-purpose computer. Rather, some special programming would be required in order to control the adjusting means. Ergo's proposed construction exemplifies this: "any programmable computer or programmable control device suitable for use in a multichannel infusion system and equivalents thereof." A computer would need special programming to be "suitable for use in a multichannel infusion system." A specially adapted computer is not a general-purpose computer.

At oral argument, Ergo argued that *Typhoon Touch Technologies, Inc. v. Dell, Inc.* supports its position because we held that algorithms may be disclosed "in prose." Oral argument at 5:10-9:10, *Ergo Licensing, Inc. v. Care-Fusion 303, Inc.*, No. 2011-1229, available at http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20

11-1229.mp3 (citing 659 F.3d 1376 (Fed. Cir. 2011)). An algorithm may be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Typhoon Touch*, 659 F.3d at 1385 (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)). Even described "in prose," an algorithm is still "a step-by-step procedure for accomplishing a given result." *Id.* at 1385 (quoting *In re Freeman*, 573 F.2d 1237, 1245-46 (CCPA 1978)). In this case, however, there is no algorithm described in any form for the function of "controlling the adjusting means." The specification merely provides functional language and does not contain any step-by-step process for controlling the adjusting means. As a result, we hold that the district court correctly determined that the "control means" terms are indefinite for failure to disclose corresponding structure.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**ERGO LICENSING, LLC
AND UVO HOLSCHER,**
*Plaintiffs-Appellants,*

**v.**

**CAREFUSION 303, INC.,**
*Defendant-Appellee.*

---

2011-1229

---

Appeal from the United States District Court for the District of Maine in Case No. 08-CV-0259, Judge George Z. Singal.

---

NEWMAN, *Circuit Judge*, dissenting.

The court again, irregularly and unpredictably, departs from the established protocols of claim drafting. The claims here at issue were written in the standard straightforward manner of thousands of claims to systems in which, in today's electronic cyber-assisted technologies, digital devices routinely perform some steps of a new system. The claims here are of that genre: certain steps are controlled by a device, in accordance with the known methods for such steps, as set forth in the patent specification.

Ergo's Patent No. 5,507,412 (the '412 patent), filed on June 14, 1994 and issued on April 16, 1996, describes a multichannel metering system in which one of multiple components called a "control means" controls various described functions. Claims 1 and 18 are shown, with boldface marking the control means aspect that my colleagues hold is inadequately described, and that they hold thereby invalidates all of the claims:

1. Multichannel metering system for metering preselected fluid flows, comprising:

a plurality of individual fluid flow sources;

a plurality of discharge lines, each line of said discharge lines being connected to a corresponding one of said fluid flow sources;

adjusting means associated with said fluid flow sources for acting on said fluid flow sources to influence fluid flow of said fluid flow sources;

**programmable control means coupled with said adjusting means for controlling said adjusting means, said programmable control means having data fields describing metering properties of individual fluid flows**;

an operating surface connected to said control means;

data input means for input of data into said control means, said data input means being at least partially connected to said operating surface;

data output means for output of data from said control means, said data output means being connected to said operating surface;

selector switch means forming a part of said data input means, said selector switch means including a plurality of selector switches, each selector switch being associated with a set of said fluid

flow sources for representing segments of data fields belonging to a corresponding set of fluid flow sources on said operating surface, said each selector switch functionally connecting said data input means with said data fields belonging to said associated set of fluid flow sources.

18. Multichannel metering system for metering preselected fluid flows, comprising: a plurality of individual fluid flow sources divided into a plurality of sets; a plurality of discharge lines, each line of said discharge lines being connected to a corresponding one of said fluid flow sources;

adjusting means associated with said fluid flow sources for acting on said fluid flow sources to influence fluid flow of said fluid flow sources;

**control means coupled with said adjusting means for controlling said adjusting means, said control means having data fields describing said fluid flow sources and metering parameters of said individual fluid flows, said control means including a meter management mode for editing and regulating said metering parameters**;

a[n] operating surface connected to said control means;

data input means for input of data into said control means, said data input means being at least partially connected to said operating surface;

data output means for output of data from said control means, said data output means being connected to said operating surface;

a plurality of selector switch means, each of said selector switch means being associated with one of said plurality of sets of said fluid flow sources, said each selector switch means placing

> said control means in said meter management mode for said associated set of fluid flow sources.

CareFusion argued that the claims are invalid for lack of described structure for "control means." The patent examiner did not deem the claims inadequate on this ground. PTO expertise in such matters as patent examination for statutory compliance warrants deference, for the PTO is "a qualified government agency presumed to have properly done its job." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984). The Administrative Procedure Act demands no less. And the court wisely established in *Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371, 1380 (Fed. Cir. 2001) that "close questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee."

The content of Ergo's '412 specification including the claims is appropriate and routine. The invention is stated to be the overall system, called a multichannel metering system, as used in medical facilities to administer medicines or nutrients to patients. From the description in the court's opinion, one would not suspect that the system is described in ten columns of specification, plus four figures. The element that the court finds to be inadequately described is the "control device" that performs the described functions.

The specification contains descriptive text in detail and completeness, describing the system in which the control device stores data fields on metering schedules. The specification starts in description of the overall system with Figure 1, and the specification describes the system, starting with reference to this figure:

> The motor drives 12, the first operation surface 5, the flow-measuring means 121, the selector

switches 13, and the display units 14 **are connected to the control device 4** via control lines 15. **The control device 4 has means for storing information, in which data fields on metering schedules of a plurality of solutions to be metered, which data fields are not represented in FIG. 1, are stored, as well as a programming means, which is likewise not shown, with which control and monitoring functions can be performed. The data fields associated with the individual solutions contain, e.g., the exact designation of tile solution, the type of the syringe, and the metering rate**.

'412 patent, col.5 ll.40-52 (emphases added). Figure 1 is as follows:



Figure 1

The '412 specification describes the function and operation of the control device, including that the control device receives information about flow quantity, and generates warning signals and control commands:

> [T]he said flow-measuring means send a flow-proportional measured quantity to the control device, and the said measured quantity is compared with stored limit values there. If necessary, the control device generates a warning signal, which is displayed on the operating surface. If the metering of the fluid flow is to be switched over to manual operation, manual metering can be blocked by the control device when the limit value is exceeded or not met.

*Id.* at col.3 ll.48-56. At col.3 ll.25-28 the specification further elaborates the operation of the control:

> When the manual operating switch is actuated, the control device generates a control command, by which the predetermined adjusting means is switched into the switched-off position.

The specification also states that "[a] multichannel metering system of this type" was known in the prior art, and at col.1 ll.25-34 describes a prior-art system of European patent 302,752:

> A flow-adjusting means, with which each fluid flow can be individually influenced, is located in the line path of each discharge line. The flow adjusting means are connected to a central, programmable control device, which is located in the lower part of the chassis, and which permits the selective actuation of the individual flow-adjusting means. The control device has a means for storing information, in which data fields on discharge

schedules of the individual types of fluids are stored.

The specification also references another metering system that appears in German patent document 33,29,977, where in that prior art system:

> [T]he metering rates of the individual fluid flows are monitored by a central control device, but an individual coding switch, with which the metering rate can be set manually, is associated with each fluid flow source. All coding switches are connected to the control device, which calculates a total rate of delivery from the individual metering rates delivered by the coding switches to the control device, and displays it via a display on the control device.

'412 patent, col.1 ll.54-62.

The panel majority is not explicit as to the specific area of inadequacy of structure on which it relies for its rejection as fatally flawed under §112 ¶6. No error is attributed to the patent examiner. The patent specification is clear that the invention is the arrangement of the components of the system, not any special or nonobvious structure of a component. The specification is clear that the inventor is not claiming the control device as its invention. The patent describes the invention that is presented for patenting:

> The basic task of the present invention is to improve a multichannel metering system such that essential operating functions are integrated on a central operating surface, on the one hand, and, on the other hand, the data fields associated with the individual fluid flow sources can be

> polled in a simple manner, and the risk of confu-
> sion of the fluids to be metered is reduced.

*Id.* at col.2 ll.6-13. It is a truism that "patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention." *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001).

The specification states that the invention is the arrangement of components, not an improvement in a control device: "The advantage of the present invention is essentially the fact that direct access to the data field of a fluid flow source or to the data fields of a predetermined group of fluid flow sources is possible by means of the selector switches." '412 patent, col.2 ll.25-28. The specification describes prior-art structures that perform control functions. *See, e.g.*, *Clearstream Wasterwater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1445-46 (Fed. Cir. 2000) (prior art disclosed in specification included in structure for claimed means when means-plus-function elements were "not the only points of novelty"). The court departs from the routines of patent protocol, in now ruling that the control device is not described in sufficient detail to meet the requirements of §112 ¶6.

No party disputed that a person of ordinary skill in the field of metering systems could routinely instruct the control device how to perform the described control. The PTO examination for compliance with §112 ¶6 did not require whatever additional description my colleagues believe to be lacking, and on which undefined lack my colleagues invalidate all of the claims.

The presentation in the Ergo patent is a typical presentation of a routine step that is performed by a known component, in the form of descriptive text and stylized

figures. This court's foray into patent draftsmanship, finding standard presentations now to be fatally deficient, adds grievous unreliability to duly granted patents. The invention patented by Ergo displays the established protocol of specification content as characterizes many thousands of computer-assisted procedures. The court now rules that "more" was needed, although I cannot discern what more, except for a five-foot shelf of zeros and ones.

The correct focus is "whether one skilled in the art would have understood that the specification of each patent disclosed structure capable of performing the function recited in the claim limitation." *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002). This court, recognizing the ease with which patent claims can later be criticized, stated in *Exxon*, 265 F.3d at 1375 that "[i]f the meaning of the claim is discernable, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." Nonetheless, my colleagues take up the opportunistic ploy of the accused infringer, and hold, on summary judgment, that §112 ¶6 has been somehow violated, although we are not told what is missing.

It was not disputed that skilled artisans would understand the "control device" to be a microprocessor or circuitry to perform the steps in accordance with the criteria described in the specification. Ergo's disclosure conforms to the established protocol. As the specification states, the "present invention" is directed to the arrangement of components, of which the "control device" is a "conventional feature," depicted in accordance with PTO practice as set forth in PTO Rule 83:

> 37 C.F.R. §1.83 Content of drawing.
>
> (a) The drawing in a nonprovisional application must show every feature of the invention specified in the claims. However, conventional features disclosed in the description and claims, where their detailed illustration is not essential for a proper understanding of the invention, should be illustrated in the drawing in the form of a graphical drawing symbol or a labeled representation (*e.g.*, a labeled rectangular box).

Although CareFusion sold its theory to my colleagues, it is curious that the description in CareFusion's own U.S. Patent No. 5,171,301, entitled "Multiple mini-pump infusion system" tracks that herein, for CareFusion recites "programmable electronic means" in some claims and depicts, as the structure that performs the function, a microprocessor as a rectangular box. '301 patent, col.4 ll.37-44; *id.* at Figure 2. Indeed, so do thousands, perhaps hundreds of thousands, of issued patents. "[A] challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77 (Fed. Cir. 2001); *see also Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003) ("VIA needed to prove, by clear and convincing evidence, that the specification lacks adequate disclosure of structure to be understood by one skilled in the art as able to perform the recited functions."). Such a finding could not be made on summary judgment, on the record in the district court.

Precedent also establishes that the specification disclose structure for performing the claimed means is "not a

high bar," *Biomedino, LLC v. Waters Technologies Corporation*, 490 F.3d 946, 950 (Fed. Cir. 2007), and "does not raise the specter of an unending disclosure of what everyone in the field knows." *Amtel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999). There was no semblance of clear and convincing evidence of insufficient disclosure in terms of §112 ¶6.

The panel majority argues that a person of skill in the field of the invention would not understand "control device" as "a known structure." Maj. Op. at 5. That argument is contrary to the specification, for "knowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness." *Creo*, 305 F.3d at 1347. Indeed, if there were some semblance of substance to this argument, again summary judgment would be negated. Further, precedent does not require a function to be implemented by a single structure. *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1322 (Fed. Cir. 2004) ("That the disputed term is not limited to a single structure does not disqualify it as a corresponding structure, as long as the class of structures is identifiable by a person of ordinary skill in the art."). As the court stated in *Telcordia Technologies, Inc. v. Ciso Systems, Inc.*, 612 F.3d 1365, 1377 (Fed. Cir. 2010), "the specification need only disclose adequate defining structure to render the bounds of the claim understandable to an ordinary artisan." *See also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) ("[T]he amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention."). These standards are met.

The panel majority also complains that no "algorithm" is presented in the specification.  My colleagues state that the "narrow exception" of *In re Katz Interactive Call Processing Litigation*, 639 F.3d 1303 (Fed. Cir. 2011) is inapplicable here because the claimed function "requires more than merely plugging in a general-purpose computer."  Maj. Op. 6-7.  My colleagues misread *Katz*.  The court ruled in *Katz* that the district court interpreted our prior cases too broadly, and reaffirmed that the requirements of §112 ¶6 are met when claimed functions are "coextensive with the structure disclosed."  639 F.3d at 1316.  *See also, e.g.*, *Telecordia*, 612 F.3d at 1376-77 ("controller" provides structure for "monitoring means," for the record showed that "an ordinary artisan would know how to interpret the specification and actually build a circuit"); *S3*, 259 F.3d at 1370-71 ("selector" shown in specification is structure for "means . . . for selectively receiving," for "[t]he uncontradicted evidence was that a selector is of well known electronic structure and performs a common electronic function, and is readily implemented from the description in the specification"); *Intel*, 319 F.3d at 1366-67 ("core logic" of a computer modified to perform a program is structure for the claimed functions, for "how to modify the core logic to perform [the program] on the circuitry level may also be properly left to the knowledge of those skilled in the art, and need not be specified in the patent"); *Linear Tech.*, 379 F.3d at 1321-22 ("PWM circuit" is structure for "second means for generating a first control signal during a first state of circuit operation," for the evidence showed that "persons of skill in the art would understand that 'PWM circuit' references a discrete class of circuit structures that perform known functions"); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338-39 (Fed. Cir. 2008) ("video standard detector" is structure for "circuitry to provide a format signal changeable in response to the

format of said video type signal," for expert testimony showed that "technology to perform the claimed function was available at the relevant time and would have been known to a person skilled in the art.").

The great weight of authority ratifies the presentation in the '412 specification. Neither CareFusion nor my colleagues on this panel have shown by clear and convincing evidence that the '412 claims are invalid for indefiniteness. The court's new position simply taints thousands of heretofore innocent patents, adding a further infusion of unreliability to the patent grant. This is of particular concern because the panel majority is not relying on newly cited references or other possible examination oversights, but is invalidating a patent on purely formalistic grounds—grounds on which the expertise of patent examination is normally superior to that of judges.

This destruction of a granted patent based on a presumably flawed disclosure in the application, at a time when it cannot be remedied, is not only a disservice to inventors who expect a reliable patent upon examination and grant, but an injury to the public that is served by patent-supported innovation. I must, respectfully, dissent.