# United States Court of Appeals for the Federal Circuit

---

**DEALERTRACK, INC.,**
*Plaintiff-Appellant,*

v.

**DAVID L. HUBER AND FINANCE EXPRESS, LLC,**
*Defendants-Appellees,*

AND

**JOHN DOE DEALERS,**
*Defendant,*

AND

**ROUTEONE, LLC,**
*Defendant-Cross Appellant.*

---

2009-1566, -1588

---

Appeal from the United States District Court for the Central District of California in consolidated case no. 06-CV-2335, Judge Andrew J. Guilford.

---

Decided: January 20, 2012

---

HENRY C. DINGER, Goodwin Procter, LLP, of Boston, Massachusetts, argued for the plaintiff-appellant. With

him on the brief were ROBERT D. CARROLL; and FORREST A. HAINLINE, of San Francisco, California.

LAWRENCE M. HADLEY, McKool Smith Hennigan, P.C., of Los Angeles, California, argued for the defendants-appellees. With him on the brief were RODERICK G. DORMAN, BRIAN L. YATES and MIEKE K. MALMBERG.

LAURENCE S. ROGERS, Ropes & Gray, LLP, of New York, New York, argued for defendant-cross appellant. With him on the brief were JESSE J. JENNER, CHING-LEE FUKUDA and BRIAN P. BIDDINGER.

———————————————

Before LINN, PLAGER, and DYK, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* LINN.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* PLAGER.

LINN, *Circuit Judge*.

Dealertrack, Inc. ("Dealertrack") appeals the grant of summary judgment of noninfringement of claims 7-9, 12, 14, 16, and 17 of U.S. Patent No. 6,587,841 ("'841 Patent") and the grant of summary judgment of invalidity of claims 1, 3, and 4 of U.S. Patent No. 7,181,427 ("'427 Patent") for failure to claim patentable subject matter under 35 U.S.C. § 101. *Dealertrack, Inc. v. Huber*, No. CV-06-2335 (C.D. Cal. Sept. 27, 2008) ("*Claim Construction*"); *Dealertrack, Inc. v. Huber*, 657 F. Supp. 2d 1152 (C.D. Cal. July 7, 2009) ("*Invalidity*"). RouteOne, LLC ("RouteOne") cross-appeals the district court's denial of summary judgment of invalidity of claims 14, 16, and 17 of the '841 Patent for indefiniteness. For the reasons set forth below, we affirm-in-part, vacate-in-part, reverse-in-part, and remand.

BACKGROUND

I.  The Patents in Suit

Dealertrack is the owner of the '841 and '427 Patents, directed to a computer-aided method and system, respectively, for processing credit applications over electronic networks.  The '841 Patent claims priority to and incorporates by reference U.S. Patent No. 5,878,403 ("'403 Patent") and uses the following incorporation language: "This is a division of application Ser. No. 08/526,776, filed Sep. 12, 1995, hereby incorporated by reference.  Now U.S. Pat. No. 5,878,403."  '841 Patent col.1 ll.5-7.  The '427 Patent also claims priority to the '403 Patent, of which it is a continuion-in-part.

Prior to Dealertrack's invention, car dealers, in seeking car loans on behalf of their customers, would apply to funding sources (i.e. banks) by: filling out application forms particular to each bank; faxing or transmitting the application to the respective banks; waiting for bank personnel to enter the application information into their internal computer systems; and eventually receiving responses from each bank.  Dealertrack proposed to automate the process through the use of a "central processor," which receives credit application data from dealers, processes the data to conform to the individual application forms of different banks, forwards the completed applications to banks selected by the dealer, receives answers from the banks, and forwards those answers back to the dealer.  Figure 1A of the '841 Patent, below, displays a preferred embodiment of the system:



'841 Patent, fig. 1A. An important feature of the invention was to allow the dealer to fill out a single application, to control which banks would receive the application, and to control the order and timing in which the applications were sent to the banks.

## II. District Court Proceedings

Dealertrack sued appellees David L. Huber and Finance Express, LLC ("Finance Express") for infringement of the '841, '427, and '403 Patents by their FEX system, and sued appellee RouteOne for infringement by its Credit Aggregation System ("CAS") and its Messenger system. The validity of the '403 Patent and infringement of any of the patents by RouteOne's Messenger system are not in dispute on appeal. All of the accused products offer automobile dealers loan management services that pass all communications between dealers and lenders through the Internet.

Appellees Finance Express, John Doe Dealers, and RouteOne (collectively, "Appellees") filed four summary judgment motions[1]: (1) non-infringement of all asserted claims of the '841 Patent based on the absence of a "communications medium," as construed by the district court, in the accused devices and based on several other proposed claim constructions; (2) invalidity of claims 14, 16, and 17 of the '841 Patent for indefiniteness under 35 U.S.C. § 112, ¶¶ 2, 6 for failure to disclose adequate structure corresponding to the purported means-plus-function "tracking" limitation; (3) invalidity of all asserted claims of the '427 Patent for failure to claim patent-eligible subject matter under 35 U.S.C. § 101; (4) invalidity of all asserted claims of the '427 Patent for failure to claim priority to the '403 Patent.

The district court agreed with Appellees' proposed claim construction of the phrase "communications medium" in the '841 Patent as "a 'network for transferring data,' not including the internet." *Claim Construction*, at 19. Because "communications medium" was a limitation in all claims of the '841 Patent, and because it was undisputed that the accused products transferred data only over the Internet, the district court granted summary judgment of non-infringement of all asserted claims of the '841 Patent. The district court denied summary judgment of invalidity for failure to disclose adequate structure for the "tracking" limitation of the claims of the '841 Patent because the district court determined that "tracking" was not part of the function of the central processing means limitation. The district court granted summary judgment of invalidity of all claims of the '427 Patent for failure to claim patent-eligible subject matter under § 101. The

---

[1] Because the procedural history specific to each of the Appellees substantially mirrors that of RouteOne, we do not separately describe the motions and dispositions filed by each of them.

district court denied summary judgment of invalidity of the '427 Patent for failure to claim priority to the '403 Patent. These rulings are all at issue on appeal—directly, as alternative grounds of affirmance, or in the cross-appeal.

Dealertrack timely appealed, and RouteOne properly cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

I. The '841 Patent

Independent claim 7 of the '841 Patent reads as follows, with the contested limitations highlighted in **bold**:

> 7. A computer based method of operating a credit application and **routing** system, the system including a central processor coupled to a **communications medium** for communicating with remote application entry and display devices, remote credit bureau terminal devices, and remote funding source terminal devices, the method comprising:
>
> selectively receiving credit application data from a remote application entry and display device;
>
> selectively obtaining credit report data from at least one remote credit bureau terminal device;
>
> **selectively forwarding** the credit application data, and credit report data if

appropriate, to at least one remote funding source terminal device; and

forwarding funding decision data from the at least one remote funding source terminal device to the respective remote application entry and display device, wherein the step of selectively forwarding the credit application data and credit report data to at least one remote funding source terminal device comprises:

sending at least a portion of the credit application data, and the credit report data if appropriate, to more than one of said at least one remote funding source terminal devices substantially at the same time.

'841 Patent col.32 l.55 – col.33 l.10. Dependent claim 8 adds "[the method of claim 7] further comprising the step of enabling reviewing, analysis and editing of the credit application data at the remote application entry and display device prior to the step of selectively forwarding the credit application data." *Id.* col.33 ll.11-15. Dependent claim 9 adds, "wherein said remote application entry and display device is located at a vehicle dealer." *Id.* col.33 ll.16-18. These claims are not argued separately.

Independent claim 14 of the '841 Patent reads as follows, with the limitations relevant to this appeal highlighted in **bold**:

14. A credit application and **routing** system, comprising:

a communications medium;

**central processing means**, operably coupled to said communications medium, for executing a computer program which implements and controls credit application processing and **routing**;

at least one credit application input terminal device, operably coupled to said communications medium, for keyboard entry of at least credit application information, for visual display of at least funding decision information, and for sending and receiving to and from said central processing means over said communications medium; and

at least one funding source terminal device, operably coupled to said communications medium, for receiving at least a portion of a credit application over said communications medium from said at least one credit application input terminal device through said central processing means, and for sending a funding decision to said at least one credit application input terminal device through said central processing means over said communications medium,

wherein said central processing means computer program which implements and controls credit application processing and **routing**, further provides for **tracking pending credit applications.**

'841 Patent col.34 l.48 – col.35 l.6.  Independent claim 12 is the same as claim 14 except for the wherein clause, which reads "wherein there are a plurality of funding source terminal devices connected to said communications medium, and wherein a credit application is sent to more than one of said plurality of funding source terminal devices over said communications medium through said central processing means."  *Id.* col.34 ll.14-19.  Independent claim 16 is identical to claim 14, but adds "at least one credit bureau terminal device, operably coupled to said communications medium, for receiving at least a portion of a credit application from said at least one credit application input terminal device through said central processing means over said communications medium, and for sending credit information to said at least one credit application input terminal device over said communications medium through said central processing means."  *Id.* col.35 ll.35-43.  Claim 17 depends on claim 16, and adds "wherein said central processing means computer program which implements and controls credit application processing and routing, further provides outcome results including approval, decline, conditional approval or a message."  *Id.* col.35 ll.49-53.

## A.  Standard of Review

Claim construction is a question of law which this court reviews de novo.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451 (Fed. Cir. 1998) (en banc).  "Where . . . the parties do not dispute any relevant facts regarding the accused product[ and] disagree [only] over which of two possible meanings of [the claim at issue] is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment."  *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

This court reviews the grant or denial of summary judgment under the laws of the regional circuit. *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1349 (Fed. Cir. 2005). The Ninth Circuit reviews grants or denials of summary judgment de novo, asking "whether there are any genuine issues of material fact" while "[v]iewing the evidence in the light most favorable to the nonmoving party." *Burke v. County of Alameda*, 586 F.3d 725, 730-31 (9th Cir. 2009).

### B. "Communications Medium"

There is no dispute that if the district court's claim construction of "communications medium" stands, Appellees are entitled to summary judgment of non-infringement.

The district court construed "communications medium" as "a 'network for transferring data,' not including the internet." *Claim Construction*, at 19. The district court grounded its construction on two bases. First, the specification included the following statement in its "Detailed description of the preferred embodiment(s)" section: "Although illustrated as a wide area network [in FIG. 1], it should be appreciated that the communications medium could take a variety of other forms, for example, a local area network, a satellite communications network, a commercial value added network (VAN) ordinary telephone lines, or private leased lines." '841 Patent col.17 l.67 – col.18 l.5. The district court noted that though "it is improper for a court to limit a patent to its preferred embodiment, it is reasonable to assume that when a patent supplies a long list of examples like here, the list is exhaustive." *Claim Construction*, at 18 (internal citations omitted). Second, the district court rejected Dealertrack's arguments that (1) references in the specification to "TCP/IP" and "CompuServe" implicitly refer to the Internet as a communication medium; (2) the ordinary mean-

ing of communications medium included the Internet; and (3) the prosecution history shows the Internet was implicitly considered a "communications medium" by the examiner and the patentee.

Dealertrack argues that in 1995 ordinary artisans would have understood that the Internet was a communications medium as the phrase was used in the '841 Patent because: (1) the specification explicitly says that "[t]he communications medium used need only provide fast reliable data communication between its users," '817 Patent col.18 ll.8-9, and is not further limited anywhere; (2) it is undisputed that the Internet is—and was in 1995—a network for transferring data; (3) the '841 Patent is a divisional of the '403 Patent, which includes the Internet as an example of a "communications medium" and is incorporated by reference into the '841 Patent; (4) the Internet is a wide area network, which is expressly cited as an example of a communications medium; and (5) during prosecution, (a) the examiner manifested an understanding that the Internet was a particular "communications medium" by making rejections over Internet-based prior art, and (b) applicant distinguished such prior art on grounds unrelated to the Internet. Dealertrack argues in the alternative that even if the Internet was not understood as a "communications medium" by ordinary artisans in 1995, it can be captured within the claim scope as after-arising technology.

Appellees counter that: (1) the specification requires that the communications medium be both reliable and secure, and the Internet was neither of these as of 1995; (2) the patentee disclaimed the Internet by capitulating to the examiner's requirement that "Internet" be removed from the specification as "new matter" after applicants attempted to insert it during prosecution; and (3) the incorporation by reference of the '403 Patent is inapposite because the Internet was improperly included in the '403

Patent's specification during prosecution, and anyway the '841 Patent, by its terms, only incorporates by reference the application that gave rise to the '403 Patent as originally filed. As to Dealertrack's alternative argument, Appellees argue that the Internet may not be captured as after-arising technology because it was in existence as of the priority date of the '841 Patent.

We agree with Dealertrack that the district court improperly carved-out the Internet from its construction of "communications medium." In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), this court "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.* at 1323. The disclosure of multiple examples does not necessarily mean that such list is exhaustive or that non-enumerated examples should be excluded. As we noted in *Phillips*, "[m]uch of the time, upon reading the specification in [] context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.* Here, the context makes clear that the examples were not meant to be definitive of the scope of "communications medium." The section in which the list of examples is found is entitled "Detailed description of the preferred embodiment(s)." '841 Patent col.17. The first paragraph of the section says: "It should be kept in mind that the following described embodiment(s) is only presented by way of example and should not be construed as limiting the inventive concept to any particular physical configuration." *Id.* col.17 ll.56-59. While in some circumstances this may be taken as rote language, the additional context of the list cannot:

> "Although illustrated as a wide area network, it should be appreciated that the communications medium could take a variety of other forms, *for example*, a local area network, a satellite communications network, a commercial value added network (VAN) ordinary telephone lines, or private leased lines. . . . The communications medium used *need only* provide fast reliable data communication between its users."

*Id.* col.17 l.67 – col.18 l.9 (emphases added). The specification thus gives a basic definition of a communications medium as anything that "need only" provide "fast reliable data communication between its users." *Id.* The list itself is explicitly prefaced with a description that the enumerated articles are "example[s]." The natural reading of this paragraph, and the only reading that does not violate this court's repeated prohibition against importing limitations from the specification, is of a non-exhaustive list that, if anything, broadens the definition of "communications medium."

Both parties agree that a "communications medium" is a "network for transferring data" and only disagree about the Internet carve-out. There is undisputed evidence in the record, not challenged on appeal, that in 1995 the Internet was a network for transferring data. More specifically, Dealertrack proffered expert testimony that in 1995 the Internet was the world's largest wide area network, an enumerated species of a communications medium in the specification. To specifically exclude the Internet would thus require a waiver of claim scope that is "both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) (internal citations and parentheticals omitted). There was no such waiver here. The only part of the record that bears on

this is a post-allowance examiner's amendment deleting the phrase "the InterNet" from the list of examples in the specification and cancelling the claims specifically directed to the Internet. The examiner did not provide reasons for the amendment, and there is no evidence that the applicant made any statements supporting patentability on the basis of the removal of that phrase from the specification. This alone is insufficient to create a waiver.

Moreover, Dealertrack points out that during prosecution of the parent '403 Patent, the examiner allowed the applicant to include "the internet" as an example of a "communication medium." Dealertrack thus contends that because the '403 Patent is expressly incorporated by reference into the '817 Patent, the specification expressly includes the Internet as an example of a communications medium. Appellees counter that only the text as filed of the application that gave rise to the '403 Patent was incorporated by reference, not the text as later amended. Appellees also contend that regardless of any incorporation by reference, the examiner's inclusion of the Internet into the specification of the '403 Patent was new matter and should not have been allowed in that patent.

We agree with Dealertrack. The '817 patent incorporates the '403 Patent using the following language: "This is a division of application Ser. No. 08/526,776 ("'776 Application"), filed Sep. 12, 1995, hereby incorporated by reference. Now U.S. Pat. No. 5,878,403." '817 patent col.1 ll.5-7. When the divisional application that gave rise to the '817 Patent was filed, the '776 Application already included the Internet as an example of a communications medium, as did the '403 Patent as issued. To suggest that the inclusion of the filing date of the '776 Application in the incorporation language was intended to limit the same to the text of that application as filed instead of as issued is unwarranted and certainly not compelled. There is no reason to conclude that the reference to the filing

date was anything other than applicant's compliance with the formal requirement to "[c]learly identify" the patent being incorporated by reference. 37 C.F.R. § 1.57(b)(2).[2]

We also reject Appellees' argument based on new matter. Appellees have argued neither a lack of written description for failure to have possession of the Internet as of the priority date, nor the ineffectiveness of the incorporation by reference. Therefore, we conclude that the inclusion of the Internet as an example of a "communications medium" is properly incorporated by reference into the '817 Patent and acts "as if it were explicitly contained therein." *See Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007).

Appellees' argument that the Internet does not fit the definition of a communications medium because the Internet was not reliable and secure is also inapposite. Appellees' only support for the unreliability of the Internet is a statement by its expert, Derek M. Kato, that "achieving appropriate levels and qualities of service through the Internet for the credit application and routing system of the '403 Patent would have been problematic." This ambivalent statement allegedly relating to reliability is insufficient to show that ordinary artisans would have considered "communications medium" to exclude the Internet. As for security, that aspect of the Internet is addressed merely as an object of the invention, and there is no indication in the patent that the security of the data transferring network was understood by

---

[2] We need not decide here whether what is incorporated is the text of the parent application as of the filing date of the divisional application, or the text of the parent as issued, because reference to the Internet as a communications medium was contained in the parent at both of these stages.

ordinary artisans to be a limit on what constituted a "communications medium."

Thus, this court concludes that the proper construction of "communications medium" is a "network for transferring data, including the Internet" and that the district court erred in granting summary judgment of non-infringement based on a construction that carved out the Internet.

## C. Alternative Grounds for Affirmance of Summary Judgment of Non-Infringement

In the district court, Appellees had moved for summary judgment of non-infringement on the basis of three other proposed claim constructions: "routing," "selective forwarding," and "central processing means." The district court rejected Appellees' claim constructions, and so, these claim constructions did not form the basis of the district court's grant of summary judgment of non-infringement of the '841 Patent.

Appellees argue here that they are entitled to summary judgment of non-infringement of all claims of the '841 Patent on the alternative grounds that the accused products lacked these three elements when properly construed.

### 1. "Routing"

| Claim Term | District Court's Construction | Appellees' Proposed Construction |
|---|---|---|
| "Routing" | "Sending or forwarding by a particular route" | "Sequencing (order) and timing" |

All asserted claims of the '841 Patent contain the "routing" limitation in the preamble, and certain claims contain it as a recitation in the body of those claims.

Appellees argue that "routing" necessarily includes the ability to select "sequencing (order) and timing," and that the district court erred by construing the phrase as "sending or forwarding by a particular route." Appellees argue that because users of the accused device can only select one or more funding sources and not the order and sequencing by which the program sends applications, there can be no infringement of a claim requiring "routing."

Appellees specifically argue that the patent twice defines "routing" as "sequencing (order) and timing" in describing the preferred embodiment:

> As already mentioned, the present invention provides flexibility in funding source selection, and *routing, i.e., sequencing and timing.* Dealer selected defaults for source and routing are provided at installation, but can be overridden on a case-by-case basis.
>
> In block **146**, a funding source (or sources) is selected to send the credit application, along with credit bureau information, if applicable. If multiple sources are to receive the credit application, *then the timing and order of sending is also selected, that is, the routing of the credit application.* Routing selections include one funding source at a time in sequence until a positive decision is returned or until a set time has elapsed (conditional), or all funding sources at once (shotgunning), for example.

'841 Patent col.22 ll.46-59 (italicized emphases added). Relying on *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d

1324, 1327, 1330 (Fed. Cir. 2003), Appellees argue that the "i.e." and "that is" phrases are used to define what "routing" means in the context of the patent.

Dealertrack responds that (1) the specification repeatedly allows sending the application to a single funding source (including in the above-cited passage), and that in such a situation there is no user-defined choice of timing or order; (2) the invention performs "routing" even when shot-gunning is selected (which sends to all at the same time), for which the order of the funding sources selected is irrelevant; (3) the specification discusses routing as incorporating a source selection component, noting, for example, a "routing means for selectively forwarding the credit application data to remote funding sources," '841 Patent col.15 ll.39-43; and (4) in the context of the patent as a whole, *see Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1373-74 (Fed. Cir. 2005), the "i.e." phrase was not used definitionally.

This court agrees with Dealertrack.  In the context of the patent, "routing" is used as a generic term to indicate the sending of applications by a particular route.  The patent contemplates that a user may "route" the application data by selecting the sequencing, timing, or both that the invention will use in sending data to several funding sources.  *See id.* col.13 ll.30-40 ("As already noted, a dealer is able to select a plurality of funding sources to which the credit application will be sent, and if more than one funding sources is selected, various options are available.  For example, the dealer may optionally send to all at once (shot-gunning), send to each in turn if the previous funding source has declined the application, send to each if the previous funding source has not responded in 'N' (a selectable number of) minutes, send to each in turn if the previous funding source has declined or conditioned the application, or any combination of the last three ways."); *id.* col.22 ll.53-55 (noting that "if multiple sources

are to receive the credit application," then the routing that takes place is "the timing and order of sending" the applications); *id.* col.28 ll.28-32 ("If more than one funding source is requested, the present invention can route the application to the next funding source either manually or automatically, after a predetermined time delay or a [sic] application rejected response, for example."). *See also id.* col.32 ll.24-37 ("**5.** A credit application and routing system . . . further comprising . . . routing means for selectively forwarding the credit application data to remote funding sources . . . wherein the routing means comprises . . . means for sending at least a portion of a credit application to more than one of said remote funding sources substantially at the same time.").

The patent also contemplates that a user may select only a single funding source. *See, e.g.*, '841 Patent, Abstract ("The computer program includes routines . . . for selectively forwarding a received credit application to at least one funding source."); *id.* col.5 ll.1-5 ("It is an object of the invention to provide a dealer with on-line and off-line entering of application data, for transfer to one or more funding sources sequentially and automatically."); *id.* col.13 ll.10-12 ("Once the dealer selects one or more funding sources, the present invention prompts the dealer for any additional information."); *id.* col.16 ll.23-30 ("According to another embodiment, there is provided a computer program having . . . means for selectively forwarding a received credit application to at least one funding source."); *id.* col.26 ll.2-5 ("'Funding Selection,' represents the operations related to funding sources and the operations related to sending a credit application to one or more sources."). The patent also categorizes this selection as "routing." *Id.* Abstract ("A credit application and routing system includes a central processor having and executing a program . . . for selectively forwarding a received credit application to at least one funding source."); *id.* col.7 ll.54-55 ("It is an object of the present

invention to route an application to one or more banks as directed by the user, or alternatively, a dealer can indicate which bank or banks to send the application to."); *id.* col.15 ll.24-30 ("In order to implement the above advantageous features, there is provided according to one embodiment a credit application and routing system comprising a central processor having a program and operation to . . . selectively forward the credit application data to at least one remote funding source terminal device."). Where only a single funding source is selected, there is no user selection of timing or sequencing as there is when multiple funding sources are selected. Moreover, when shot-gunning is selected, there is no user selection of the order in which the applications are sent, yet the patent categorizes this too as "routing." Thus, the phrase "routing," in the context of this patent, is not limited to the particular species of routing occurring when the user selects multiple funding sources.

The only way that the "i.e." in this patent could be read definitionally is if it excluded from the claim scope the embodiments discussed throughout the claim where only a single funding source is selected. This "is rarely, if ever, correct." *Pfizer*, 429 F.3d at 1374. Moreover, the most natural reading of the "i.e." here is as citing examples, which, as discussed by the district court, is the way it was used throughout the specification in other contexts. *See Claim Construction*, at 6 (citing '403 Patent col.10 ll.41-44) ("'I.e.' as used in this patent . . . . appears to supply examples. For instance, the patent refers to 'selecting the funding sources for a type of credit application, i.e., finance versus lease, 'A' quality versus 'B & C' quality.'").

This is precisely the type of contextual analysis we required in *Pfizer*, in determining whether the patentee's use of "i.e." was definitional. 429 F.3d at 1373-74 (requiring consideration of written description as a whole and

concluding that "i.e." as used in the specification was not definitional because of inconsistent usage in the specification). "It is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent." *Id.* at 1373 (citing *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001)). Here, internal consistency can only be achieved by reading "i.e." as exemplary. Under that reading, "sequencing (order) and timing" is a species of routing, achieved when the user selects more than one funding source, and the general construction of routing incorporates both that species and the species of routing involving the sending of application data to a single funding source and shot-gunning to all sources at once. The district court's construction of "routing" as "sending or forwarding by a particular route" adequately maintains consistency in the patent in a way that a definitional reading of "i.e." would not.

For the reasons set forth above, we find no fault in the district court's construction of "routing."

### 2. "Selectively Forwarding"

| Claim Term | District Court's Construction | Appellees' Proposed Construction |
|---|---|---|
| "Selectively Forwarding" | "Forwarding to particular (i.e. 'selected') destination(s)" and in claim 7, "[t]he 'selection' described involves choosing the remote funding source terminal devices." | "Forwarding using a selected sequence (order) and timing" |

Appellees next argue that the district court erred in its construction of "selectively forwarding." The basis for Appellees' argument is that FIGs. 3T, 2C-1, and 2C-2, in claims 7-9 of the '841 patent, show a preferred embodiment having three possible "[r]outing selections" for sending a credit application to multiple lenders, including: (1) sending the application to "one funding source at a time in sequence until a positive decision is returned"; (2) sending the credit application to a first lender, and then sending the application to a second lender after "a set time has elapsed"; or (3) sending the credit application to "all funding sources at once (shotgunning)." '841 Patent col. 22 ll. 46-65. RouteOne contends that the "selectively forwarding" claim limitation should be construed such that the claims require a user to *select* one *of multiple* such routing schemes, excluding methods and systems that permit only *one* routing selection scheme (such as only the "shotgunning" method). We disagree.

As discussed in connection with the "routing" construction above, the patent contemplates a user's ability to apply to only a single funding source, in which instance neither the timing nor the sequence is relevant. As a general rule, "it is improper to read limitations from a preferred embodiment described in the specification— even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010), *cert. denied on other grounds*, --- S. Ct. ---, 2011 WL 2437054 (June 20, 2011). There is no such indication in the intrinsic record here and, thus, no basis to overturn the district court's construction of this claim term.

Moreover, the language of the claims using the term "selectively forwarding" clearly indicates that the patentee intended some claims to cover embodiments that implement only one of the disclosed routing schemes, as

opposed to limiting every claim to the preferred embodiment that offers all three. For example, claim 1 of the '841 Patent is directed to the first routing scheme described above, as it recites "means for sending at least a portion of a credit application to more than one of said remote funding sources *sequentially until a funding source returns a positive funding decision . . . .*" '841 Patent col.31 ll.51-65 (emphasis added). Similarly, claim 3 is directed to the second routing scheme, reciting "means for sending at least a portion of a credit application to a first one of said remote funding sources, and then, *after a predetermined time delay*, sequentially sending to each other remote funding source in turn . . . ." *Id.* col.32 ll.3-17 (emphasis added). Finally, claim 7 is directed toward the "shotgunning" approach, as it recites the step of "selectively forwarding the credit application data . . . to more than one . . . funding source terminal devices *substantially at the same time*." *Id.* col.33 ll.8-10 (emphasis added). Claim 5 recites an embodiment including all three schemes. *See id.* col.32 ll.25-50.

By specifically and separately claiming each of the disclosed routing schemes in different claims, and by using the term "selectively forwarding" in those claims, the patentee made clear that he intended at least some of the claims to cover embodiments that implement only one of the routing schemes. We therefore decline to construe the "selectively forwarding" limitation as requiring that a user select between multiple different routing schemes.

### 3. "Central Processing Means"

| Claim Term | District Court's Construction | Appellees' Proposed Construction |
|---|---|---|
| "Central Process-ing Means" | "A mainframe, super-mini or minicomputer system and a database." | "A main-frame, super-mini, or minicomputer system, with an operating system and a computer program on a computer readable storage medium for executing the specific algorithms disclosed in FIGs. 2, 2B, 2C-1, 2C-2, and 2D." |

Claims 12, 14, 16, and 17 contain the limitation, "central processing means, operably coupled to said communications medium, for executing a computer program which implements and controls credit application processing and routing." *E.g.*, '841 Patent col.33 ll.61-64. Both parties agree that the claim is written in means-plus-function terms and thus invokes section 112, paragraph 6. Both parties also agree that the function of the limitation is to "execute a computer program which implements and controls credit application processing and routing."

The parties dispute the associated structure. Specifically, Appellees argue that the structure necessarily includes the algorithms disclosed in the specification in FIGs. 2, 2B, 2C-1, 2C-2, and 2D under *WMS Gaming v. International Game Technology*, 184 F.3d 1339 (Fed. Cir. 1999), and *Aristocrat Technologies. Austl. PTY Ltd. v. International Game Technology*, 521 F.3d 1328 (Fed. Cir. 2008). Appellants argue that the district court properly

determined that the structure was "[a] mainframe, super-mini or minicomputer system and a database," because including the algorithm within the structure would require that a computer with a computer program that implements and controls credit application processing and routing would have to be the structure that "execut[es]" that same program.

In *Aristocrat*, this court stated:

> For a patentee to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that function amounts to pure functional claiming. Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to "the corresponding structure, material, or acts" that perform the function, as required by section 112 paragraph 6.

*Aristocrat*, 521 F.3d at 1333. Therefore, "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the [corresponding] structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" *Id.* (quoting *WMS Gaming*, 184 F.3d at 1349).

While Appellees' argument has a purely semantic appeal, we do not believe the inclusion of the phrase "for executing a computer program which," takes the claim out of the *Aristocrat* and *WMS Gaming* rule.

First, section 112, paragraph 6 incorporates a deliberate quid pro quo: the patentee is allowed to claim a limitation in broad functional language, "provided that the specification indicates what structure constitutes the means for performing the claimed function." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 n.1 (Fed. Cir. 2007). The indicated structure must limit the claim so as not to allow pure functional claiming. Here, the "mainframe, super-mini or minicomputer system, and a database" structure as construed by the district court places no limits on the functional language of the claim. Without specifying a program, a computer alone "does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6." *Aristocrat*, 521 F.3d at 1333.

Second, the claim here recites that the program "implement[s] and control[s] credit application processing and routing." The claim would not be saved from pure functional claiming, and thus indefiniteness, without reference to the algorithms set forth in the specification, which are necessary to the performance of those recited functions.

A general purpose computer can perform the claimed function of "executing a computer program which implements and controls credit application processing and routing" only if the program it executes is capable of performing those functions. That the true functional requirements of the limitation are nested within the generic function of executing a program does not change this fact; though the computer itself may execute a computer program, it may not execute *that* computer program without the algorithms.

Finally, claims 14, 16, and 17 demonstrate the patentee's understanding that the phrase "executing a com-

puter program which" does not change the basic means-plus-function calculus. Those claims contain the following limitation: "wherein said central processing means computer program which implements and controls credit application processing and routing . . . ." '841 Patent col.35 ll.3-5. Thus, the patent itself equates "central processing means computer program" with "central processing means *for executing* a computer program."

Dealertrack's argument that a program cannot be included in the structure that executes the program is inapposite. In light of the above, the claims here are no different than the claims at issue in *WMS Gaming* and *Aristocrat*.

We therefore conclude that the appropriate structure must include the algorithms disclosed in the specification that "implement[] and control[] credit application processing and routing." Dealertrack argues that even if the structure includes the algorithms in the specification, the accused product need not contain equivalent structure to *all* the algorithms disclosed in Figures 2, 2B, 2C-1, 2C-2, and 2D, but only equivalent structure to *at least one* of the "distinct and alternative structures for performing the claimed function," *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1345 (Fed. Cir. 2002), disclosed in the specification. For example, Dealertrack argues that the accused may infringe if it sends credit application data simultaneously to all banks, even if it cannot send the data sequentially or with a predetermined time delay, as disclosed in Figure 2C-2.

This court agrees. In *Creo*, the written description contained four algorithms, corresponding to four different offset corrections in a printing process. *Id.* We noted that "the written description may disclose distinct and alternative structures for performing the claimed function" and that the performance of any one of which (or their equiva-

lents) would fall within the scope of the claims, where "[n]othing in the patent requires a single structural embodiment corresponding to the 'means for offsetting' in original claim 1 to be capable of performing all four of the algorithms disclosed." *Id.* The same reasoning applies here. The routing algorithms disclosed in the written description here "implement[] and control[] credit application processing and routing," and constitute alternative structures for purposes of construction of the means-plus-function element.

Because we modify the district court's claim constructions of "communications medium" and "central processing means," we vacate the district court's summary judgment of non-infringement and remand to the district court to determine infringement in the first instance applying these constructions.

## D. Cross-Appeal: Invalidity for Indefiniteness

Claims 14, 16, and 17 add the following limitation: "wherein said central processing means computer program which implements and controls credit application processing and routing, further provides for tracking pending credit applications." '841 Patent col.35 ll.3-6.

In its cross-appeal, RouteOne argues that this limitation must be added to the function of the central processing means limitation, and that, because there is no structure disclosed in the specification for tracking pending credit applications, the claims are indefinite. Dealertrack responds that this case is substantially similar to *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332 (Fed. Cir. 2002), where we held that the limitation "corona means cooperating with [the attenuator] and positioned for electrostatically charging the filaments" did not include "positioned for electrostati-

cally charging the filaments" within the function of the "corona means."

In our view, it is clear that claims 14, 16, and 17 recite an additional function for the "central processing means" to perform—i.e., the function of "further provid[ing] for tracking pending credit applications." As discussed above, the appropriate structure for the "central processing means" limitation must include the algorithms disclosed in the specification that "implement[] and control[]" the recited functions that the "central processing means" is required to perform. However, the '841 Patent's specification discloses no algorithm pursuant to which the "central processing means" could perform the claimed function of "tracking." The "central processing means" term is therefore indefinite, as used in claims 14, 16, and 17, for failure to recite sufficient structure to perform its claimed functions. *See Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009); *Aristocrat*, 521 F.3d at 1333; *WMS Gaming*, 184 F.3d at 1349. The district court therefore legally erred in denying the motion for summary judgment of invalidity for indefiniteness.

## II. Invalidity of the '427 Patent

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."[3]

---

[3] With all due respect, the dissent's effort to define a more efficient judicial process, as laudable a goal as that may be, faces several obstacles. First, the Supreme Court characterizes patent eligibility under § 101 as a "threshold test." *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) ("*Bilski II*") ("The § 101 patent-eligibility inquiry is only a

35 U.S.C. § 101. The Supreme Court has set forth three broad categories of subject matter ineligible for patent protection: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 130 S. Ct. at 3225 (2010). It therefore generally follows that any invention within the broad statutory categories of § 101 that is made by man, not directed to a law of nature or physical phenomenon, and not so manifestly abstract as to preempt a fundamental concept or idea *is* patent eligible. *See Diamond v.*

---

threshold test."). Second, the "defenses provided in the statute," § 282, include not only the "conditions of patentability" in §§ 102 and 103, but also those in § 101. *See Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 661 (Fed. Cir. 2008) ("It has long been understood that the Patent Act sets out the conditions for patentability in three sections: sections 101, 102, and 103." (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966))). *See also Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) ("The title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, it is of use only when it sheds light on some ambiguous word or phrase." (quoting *Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-529 (1947))). Finally, the motion for summary judgment alluded to by the dissent was filed by Dealertrack, not Appellees, and sought summary judgment of nonobviousness. *See* Plaintiff Dealertrack's Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment of Failure to Prove Invalidity of the Patents-In-Suit Based on Coinlink, *Dealertrack, Inc. v. Huber*, No. 06-cv-2335 (C.D. Cal. May 18, 2009), ECF No. 703. In opposition, Appellees argued to the district court that summary judgment of obviousness was improper and that the issue should go to trial. Thus, the resolution of Dealertrack's motion would not have decided the case absent a *sua sponte* determination of obviousness as a matter of law.

*Chakrabarty*, 447 U.S. 303, 309 (1980) ("Congress intended statutory subject matter to 'include anything under the sun that is made by man.'" (internal citation omitted)); *Research Corp. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010). The vast number of claims pass this coarse eligibility filter. Their patentability is properly measured against other provisions of Title 35.

Turning to the claims at issue here, claim 1 of the '427 Patent reads:

> 1. A computer aided method of managing a credit application, the method comprising the steps of:
>
> [A] receiving credit application data from a remote application entry and display device;
>
> [B] selectively forwarding the credit application data to remote funding source terminal devices;
>
> [C] forwarding funding decision data from at least one of the remote funding source terminal devices to the remote application entry and display device;
>
> [D] wherein the selectively forwarding the credit application data step further comprises:
>
> [D1] sending at least a portion of a credit application to more than one of said remote funding sources substantially at the same time;
>
> [D2] sending at least a portion of a credit application to more than one of

said remote funding sources sequentially until a finding [*sic,* funding] source returns a positive funding decision;

[D3] sending at least a portion of a credit application to a first one of said remote funding sources, and then, after a predetermined time, sending to at least one other remote funding source, until one of the finding [*sic,* funding] sources returns a positive funding decision or until all funding sources have been exhausted; or,

[D4] sending the credit application from a first remote funding source to a second remote finding [*sic,* funding] source if the first funding source declines to approve the credit application.

'427 Patent col.20 l.54 – col.21 l.14. The patent eligibility of dependent claims 3 and 4 is not separately argued on appeal and, therefore, will not be separately addressed. The district court determined that "computer aided method" in the preamble was limiting, but did not further define the phrase. The district court then construed "remote application entry and display device" as "any device, e.g., personal computer or dumb terminal, remote from the central processor, for application entry and display." *Id.* at 27. Similarly, "terminal device" was construed as "any device, e.g., personal computer or dumb terminal, located at a logical or physical terminus of the system." *Id.* at 20. Appellant has not appealed these constructions.

Applying this court's then definitive machine-or-transformation test, the district court determined that claims 1, 3, and 4 of the '427 Patent did not constitute

patent-eligible subject matter. Because Dealertrack did not argue that the claims effected a transformation, the court applied only the machine prong of the test. Relying on a number of decisions by the Board of Patent Appeals and Interferences and the decision in *Cybersource Corp. v. Retail Decisions, Inc.*, 2009 U.S. Dist. LEXIS 26056 (N.D. Cal. Mar. 26, 2009), *affirmed* No. 2009-1358 (Fed. Cir. Aug. 16, 2011), the district court determined that because the computer implicated was not "specially programmed" and "nothing more than a general purpose computer that has been programmed in some unspecified manner," it could not constitute the "particular machine" required to confer patent eligibility under the machine prong of *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (en banc) ("*Bilski I*"). *See Cybersource*, 2009 U.S. Dist. LEXIS 26056; *Ex parte Nawathe*, No. 2007-3360, 2009 WL 327520 (BPAI Feb. 9, 2009); *Ex parte Gutta*, No. 2008-3000, 2009 WL 112393 (BPAI Jan. 15, 2009); *Ex Parte Cornea-Hasegan*, 89 U.S.P.Q.2d (BNA) 1557 (BPAI Jan. 13, 2009).

On appeal, Dealertrack argues that (1) the claims here are unlike those in *Gottschalk v. Benson*, 409 U.S. 63 (1972) ("*Benson*"), *Parker v. Flook*, 437 U.S. 584 (1978) ("*Flook*"), and *Bilski II,* 130 S. Ct. 3218, where the claims were held patent ineligible, because those cases involved claims reducible to a mathematical formula, and there is no mathematical formula implicated in the claims of the '427 Patent; (2) the claims here are not abstract because they provide "a concrete, practical solution to a long-felt problem in the automotive finance industry" that "greatly increased the efficiency of processing automotive credit applications" and was "rapidly adopted in the industry," Appellant Br. at 47; (3) to be patent eligible, claims need not be tied to a "special purpose" computer, i.e. a programmed computer, but rather it is sufficient that they be tied to a "general purpose" computer, which they are here: the central processor, remote application entry and display devices, and funding source terminal devices; and (4)

even if a general purpose computer may not constitute the "machine" for § 101 purposes, the claims describe how to program the computer by reference to the flow charts in the specification, and the steps set forth in the claims constitute the programming of the general purpose computer, making it a special purpose computer sufficient to meet the machine prong.

Appellees counter that (1) the claims "preempt all manner of sending information back and forth, at specified time intervals or in sequence, from a dealer to a lender or from a lender to another lender," and thus are claims to an abstract idea, Huber Br. at 28; (2) the field of use restriction to auto dealers does not save the claim from abstraction because the restriction is just like that in *Flook*; (3) the claims here are unlike those in *Diamond v. Diehr*, 450 U.S. 175 (1981) ("*Diehr*") because no transformation took place here; (4) the claims are not tied to a particular machine because "computer aided" only requires performance with the "aid" of a computer for any single step, e.g., as a display device; (5) even if the claims require the computer to perform all the steps, the claim only requires a general purpose computer, which is not a "particular machine"; and (6) the claims do not require a specific algorithm because if they did, the claims would be indefinite for failure to disclose sufficient structure.

"Whether a patent claim is drawn to patent-eligible subject matter is an issue of law that is reviewed de novo." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1331 (Fed. Cir. 2010). In *Research Corp.*, we recently admonished that for abstractness to invalidate a claim it must "exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act." 627 F.3d at 868. This is in recognition of the clear congressional mandate that a very broad swath of inventions

be eligible for patent protection. *Bilski II*, 130 S. Ct. at 3225 (citing *Chakrabarty*, 447 U.S. at 308); *Prometheus Labs. v. Mayo Collaborative Servs.*, 628 F.3d 1347, 1353 (Fed. Cir. 2010); *Research Corp.*, 627 F.3d at 867. In this case, however, we are compelled to conclude that the claims are invalid as being directed to an abstract idea preemptive of a fundamental concept or idea that would foreclose innovation in this area.

Dealertrack's claimed process in its simplest form includes three steps: receiving data from one source (step A), selectively forwarding the data (step B, performed according to step D), and forwarding reply data to the first source (step C). The claim "explain[s] the basic concept" of processing information through a clearinghouse, just as claim 1 in *Bilski II* "explain[ed] the basic concept of hedging." *See Bilski II*, 130 S. Ct. at 3231. The steps that constitute the method here do not "impose meaningful limits on the claim's scope." *Bilski I*, 545 F.3d at 961-62 (citing *Benson*, 409 U.S. at 71-72). Neither Dealertrack nor any other entity is entitled to wholly preempt the clearinghouse concept.

Dealertrack's primary argument is that the "computer-aided" limitation in the preamble sufficiently limits the claims to an application of the idea. We disagree.

Although the district court construed "computer aided" as a limitation, the '427 Patent "does not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent." *See Invalidity* at 6-7. The claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method. The undefined phrase "computer aided" is no less abstract than the idea of a clearinghouse itself. Because the computer here "can be programmed to perform very different tasks in very

different ways," *Aristocrat*, 521 F.3d at 1333, it does not "play a significant part in permitting the claimed method to be performed." *Cybersource*, slip op. at 19 (citing *SiRF Tech.*, 601 F.3d at 1333). Simply adding a "computer aided" limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible. *See SiRF*, 601 F.3d at 1333 ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.").

The claims here do not require a specific application, nor are they tied to a particular machine. The computer here does no more than the computer in *Benson* to limit the scope of the claim. The process in *Benson* covered the use of binary-coded decimal ("BCD") to pure binary conversion in "the operation of a train[, or the] verification of drivers' licenses[, or the] researching [of] the law books for precedent . . . performed through any existing machinery or future-devised machinery." 409 U.S. at 68. Similarly, here, the claims cover a clearinghouse process using any existing or future-devised machinery.

Nor are the claims here analogous to those in *Ultramercial, LLC v. Hulu, LLC*, No. 2010-1544 (Fed. Cir. Sept. 15, 2011). Unlike in *Ultramercial*, where this court found that the patent claimed a practical application with concrete steps requiring an extensive computer interface, *id.* slip op. at 11, the claims here recite only that the method is "computer aided" without specifying any level of involvement or detail. The fact that certain algorithms are disclosed in the specification does not change the outcome. In considering patent eligibility under § 101, one must focus on the claims. This is because a claim may "preempt" only that which the claims encompass, not

what is disclosed but left unclaimed. Here, the claims of the '427 Patent were construed not to be limited to any particular algorithm. Dealertrack has not appealed the district court's construction.

Lastly, Dealertrack argues that the claim is patent eligible because it covers the use of a clearinghouse only in the car loan application process, and not all uses thereof. Although directed to a particular use, it nonetheless covers a broad idea. In *Bilski II*, the Supreme Court explained that the dependent claims were not patent eligible though they "limit[ed] an abstract idea to one field of use or add[ed] token postsolution components." 130 S. Ct. at 3231. *See also Diehr*, 450 U.S. at 192 n.14 ("A mathematical formula does not suddenly become patentable subject matter simply by having the applicant acquiesce to limiting the reach of the patent for the formula to a particular technological use.").

The restriction here is precisely the kind of limitation held to be insufficient to confer patent eligibility in *Bilski II*. The notion of using a clearinghouse generally and using a clearinghouse specifically to apply for car loans, like the relationship between hedging and hedging in the energy market in *Bilski II*, is of no consequence without more. *See Diehr*, 450 U.S. at 191 (noting that the principle that a mathematical formula "is not accorded the protection of our patent laws . . . cannot be circumvented by attempting to limit the *use* of the formula to a particular technological environment" (emphasis added)).

For the foregoing reasons, we affirm the determination of the district court that claims 1, 3, and 4 of the '427 Patent are patent ineligible abstract ideas under § 101.

Because of our disposition of this issue, we need not address Appellees' alternative grounds for affirmance concerning the '427 Patent.

CONCLUSION

For the foregoing reasons, we affirm the district court's construction of "routing" and "selectively forwarding," modify the district court's constructions of "communications medium" and "central processing means," reverse the district court's denial of summary judgment on indefiniteness, and vacate and remand the district court's summary judgment of non-infringement of the asserted claims of the '841 Patent. We affirm the district court's summary judgment of invalidity of claims 1, 3, and 4 of the '427 Patent as claiming patent ineligible subject matter under § 101.

**AFFIRMED-IN-PART, VACATED-IN-PART, REVERSED-IN-PART, AND REMANDED**

COSTS

Each party shall bear its own costs.

# United States Court of Appeals
# for the Federal Circuit

---

**DEALERTRACK, INC.,**
*Plaintiff-Appellant,*

**v.**

**DAVID L. HUBER AND FINANCE EXPRESS, LLC,**
*Defendants-Appellees,*

**AND**

**JOHN DOE DEALERS,**
*Defendant,*

**AND**

**ROUTEONE, LLC,**
*Defendant-Cross Appellant.*

---

2009-1566, -1588

---

Appeal from the United States District Court for the Central District of California in consolidated case no. 06-CV-2335, Judge Andrew J. Guilford.

---

PLAGER, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I join the court's opinion and conclusions regarding the several issues addressing infringement of the '841 patent.

However, as a matter of efficient judicial process I object to and dissent from that part of the opinion regarding the '427 patent and its validity under §101, the section of the Patent Act that describes what is patentable subject matter. I believe that this court should exercise its inherent power to control the processes of litigation, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), and insist that litigants, and trial courts, initially address patent invalidity issues in infringement suits in terms of the defenses provided in the statute[1]: "conditions of patentability," specifically §§102 and 103, and in addition §§112 and 251, and not foray into the jurisprudential morass of §101 unless absolutely necessary.

At issue before the trial court was the validity of a patent (the '427 patent) which the patentee was attempting to enforce against an alleged infringer. The trial court had before it several summary judgment motions, including one addressing §103 (obviousness), as well as one addressing §101. The trial court chose to decide the case under §101, rather than on the §103 issue. In my view that was an error that this court can and should correct.

I respectfully dissent from the panel's failure to insist that this case be heard and decided pursuant to the Patent Act's requirements and the efficient administration of justice. I would vacate the trial court's judgment regarding §101 and remand for a determination of validity under the conditions of patentability raised by the parties, in this case specifically the §103 issue.

---

[1]    35 U.S.C. §282.